WILLIAM L. PAYNE v. RICHARD S. PARKER, TRUSTEE.

[48 South. 835.]

1. SALES. *Conditional. Reservation of title. Seller's rights. Prerequisites to.*

In order for a seller of personal property to enforce title thereto reserved by him to secure its purchase price:

(*a*) He must have been in fact the owner of the property at the time of the sale; and

(*b*) He must have made a real, not a mere formal, sale to a real, not a mere formal, purchaser; and

(*c*) The actual possession of the property must in fact have passed by the sale.

2. SAME. *Verbal mortgage. Case.*

Where a debtor intending to secure his debt, verbally sold his personal property to his creditor and, as a part of the same transaction, the creditor verbally resold the property to the debtor, reserving the title until the indebtedness should be paid, there being no other than a mere constructive delivery in each instance, the transaction amounted only to a verbal mortgage.

FROM the circuit court of Lee county.

HON. EUGENE O. SYKES, Judge.

Payne, appellee, was plaintiff in the court below; Parker, trustee, appellant, was defendant there. From a judgment predicated of a peremptory instruction in plaintiff's favor defendant appealed to the supreme court.

Parker, the appellant, was trustee in a deed of trust executed by one James Little for the benefit of Thompson & Son, the deed of trust conveying two mules and a mare. As trustee Parker took possession of the animals; whereupon Payne, the appellee, instituted this replevin suit to recover their possession. Payne's claim was based upon an alleged reservation of title by him as seller of the property until the full amount of the purchase price due from Little, the alleged buyer, should be paid.

The facts are fully stated in the opinion of the court.

*Anderson & Long,* for appellant.

We do not contend that under the law of this state, the seller of personal property cannot reserve the title until the same is paid for, and neither do we contend that any writing is necessary for this purpose, but we do contend, that, in order for a seller of personal property to reserve the title, or to be a seller thereof, he must be the owner of the property at the time of the sale and must have the title thereto, and also must have possession or right to the possession at the time he sells it or at some future time. In this case, appellee had neither the title, possession nor right to possession of the mules and mare at the time he claims to have sold them to Little and to have reserved the title in himself. According to his testimony, which is all there is on this point, he contends that in one conversation or verbal contract he bought from, and sold back the mare and mules to Little, and that Little sold to him and bought back the same property. In other words he claimed that both of them in one conversation, or deal, were buyers and sellers of the same property.

In order to constitute a transaction a sale there must be a subject matter, a purchaser and a seller; and the purchaser must acquire the title to the subject matter and the possession or right to the possession, either present or in the future. Under appellee's testimony he never did acquire the possession of the mules and mare, it was not intended for him to have the possession thereof, nor did he get the right to the possession, either present or in the future; for in one offer he bought and sold, and in one acceptance Little sold and bought. Had appellee asked Little for the possession, Little's reply would have been: "You are not entitled to the same, and have never been entitled to anything except the $325 when it is due." Had the mules and mare dropped dead prior to the conversation, during the time of it, or afterwards, the property would have been Little's and

whatever loss there would have been would have fallen upon Little and not upon appellee. Little would still have owed appellee the amount of money due him, for which appellee could have sued him, and realized the amount by judgment and execution, and there was never a time in the whole transaction when the property was appellee's, and when Little would have been absolved from liability to pay appellee the amount of the debt Little owed him. There never was a time in the whole deal when appellee could have sold the live stock to a third party, and when Little could have been forced to surrender the possession of the same, nor was there ever a time that appellee could have replevied the stock from Little, and have claimed the property, instead of the $325 due him.

The doctrine by which sellers of personalty are allowed to reserve the title therein as against innocent third persons without placing such reservation of record, operates as a hardship on the purchasers thereof in good faith and on *bona fide* encumbrancers, and such doctrine will not be extended to cases not strictly within the terms and letter of the law. The only reason why this doctrine is supposed to be fair and just is, that, as the seller of personal property has lately had possession of the property and parted with the same, this is presumed to be notice of how it is held by his vendee. In this case appellee never had at any time the possession of the mules and never had the title thereto, and it had been, according to his testimony, three years or more since he had had the mare in his possession; and during this time he had taken a note and deed of trust on the mare, placed it of record, and had marked it satisfied of record, thus leading the public not only to decide that Little was the owner, but that he, the appellee, had been paid in full for her.

It is often difficult to decide whether a transaction is a conditional sale or a mortgage, and the usual ruling is that where one party owes the other a debt and property is used for the security of the payment of the debt and the debt is kept alive, the transaction is a mortgage and not a conditional sale. The

intention of the parties, to be gleaned from all of the facts in the sale, is also a controlling factor in deciding whether the deal is a mortgage or a conditional sale: *Sewall v. Henry* 9 Ala. 33; *Rockwell v. Humphreys,* 57 Miss. 410; *Weatherly v. Weatherly,* 40 Miss. 462; Lawson's Rights & Practice, sec. 3076.

If this transaction between appellee and Little is held to be a conditional sale of the property from appellee to Little, and to bind *bona fide* purchasers and encumbrances, then the giving of trust deeds on personal property for the security of the money in any case is a waste of time, labor and expense for recording fees. All a creditor would have to do would be, in one breath to buy his debtor's property and then sell it back to the debtor and reserve the title, without any change of possession, or right to possession, and without anything existing, to give the public any notice of such rights. Or if one person should desire to borrow money from another, and hold personal property for security, all he would have to do would be to say: "I sell you this horse for $100 and buy him back for $100 and he is yours until paid for;" and on the purchaser's handing over the money the transaction would be complete.

Who can reserve the title? No one except the owner. Who is the owner? That person having the title and the right to dispose of property. In this case, as we have said above, Payne, the appellee, was never the owner of the mules or mare and never had the right at any time to dispose of them, and at best, from all of the testimony, he only had an equitable claim or mortgage, not shown of record, against the mules and mare, and of which Thompson & Son had absolutely no notice or knowledge. The deal or transaction between Payne, the appellee, and Little, the owner of the mules and mare, is almost exactly the same as the deal between the parties in the case of *Barnes v. Holcomb,* 12 Smed. & M. 306, except that in the case cited the instrument which was attempted to be declared a conditional sale instead of an equitable mortgage and the accompanying papers which were given with such instrument, were

all in writing, but yet the facts and intentions of the parties in
the *Barnes case, supra,* were identically the same as the inten--
tions and conduct of the appellee and Little here. In the *Barnes
case,* the transaction was declared to be a mortgage and not a
conditional sale, and it was also held that an absolute purchase
under the facts of the case could have hardly been contem--
plated by the vendee. Of course, no absolute purchase of the
mules and mare was ever contemplated or had by Payne, the
appellee, in the present case.

In *Klein v. McNamara,* 54 Miss. 90, the following is laid
down as a test of whether an instrument or a transaction is a
mortgage or a sale: "(1) Was the treaty in reference to a bor--
rowing and lending of money, and was the obligation to repay
incurred? (2) Did the relation of creditor and debtor exist
before the conveyance, and did that relation continue?
(3) Was there great disparity in the price of the property?"

In case of doubt, the court leans in favor of a mortgage,
rather than a sale. 6 Am. & Eng. Ency. of Law (2d ed.) 443,
notes. The distinction between a mortgage and a conditional
sale is, that when the relation of debtor and creditor still re--
mains as to the money to be used in the repurchase or redemp-
tion the transaction is a mortgage; otherwise it is a conditional
sale. *Hoopes v. Bailey,* 6 C. 325.

The operation of the principle contended for by appellee
would result in the state of Mississippi and the different counties
being swindled out of hundreds of thousands of dollars of taxes
due by a host of money sharks and tax-dodgers.

*Clayton, Mitchell & Clayton,* for appellee.

The only question in this case is whether with reference to
third parties there was a valid sale of this property. Appellee
was the only witness before the court, who could have known
the facts about the sale, and his testimony is very clear as to
the terms of the sale. He testified that Little came to him and
proposed to sell to him the mules and said that if Payne would

pay him $50 cash and pay off the deed of trust on the mules, the mules would be Payne's. Payne agreed to this proposition and at the very instant in which he did so the title to the mules became vested in appellee. Appellee then sold the mules back to Little for $200 with ten per cent. added, at the same time reserving the title. That is, they agreed at this time to draw up a note to such effect at any time appellee might desire. Appellant questions the rights of parties to buy and sell in the same transaction, but the business world can furnish many examples of valid trades in which the same parties buy and sell personal property in one deal. As to the mare, the evidence shows that the title to her was originally in appellee, that he sold her to Little and took a deed of trust from Little to secure the payment of the purchase price, that appellee held this deed of trust while Little lived on another man's land; that when Little moved back on appellee's land they cancelled the deed of trust, and that appellee took the mare back, and afterwards sold her to Little again as shown by the note. We can find nothing wrong with this deal. Appellee testifies very clearly that there was a sale and his testimony was uncontradicted. Appellant's counsel base almost all of their argument upon the hypothesis that the note operated as a mortgage and not as a sale. In determining this question the first thing the court must look to is the instrument itself. Of course this is not conclusive, but must be given great weight by the court. In this case there is no room for any doubt arising from the face of the instrument. It is clearly and unmistakably a note reserving title. Then, if it was intended otherwise, such intent must be shown by parol. The record is silent as to any other intention. The only party to the transaction who testified averred that the parties intended it just as written, that he intended to take just this kind of a note, and that the other party intended to make the contract as written. But the appellant insists that appellee took the note as security for the purchase price. What else would he have to take it for? Surely not

just for sport. This court has said several times that the purpose of a note reserving title is only for security of the purchase money. This was decided in *Dederick v. Wolfe,* 68 Miss. 500; *Tufts v. Stone,* 70 Miss. 54; *Foundry Co. v. Ice Co.,* 72 Miss. 608. From the standpoint of reason we insist that this could be the only purpose of taking such a note.

Appellant's counsel are not altogether consistent in their argument of this case. In the first part of their brief they insist that appellee never at any time had title to the mules, and in the second division they argue that appellee sold the mules to Little and that instead of reserving title he took a mortgage on the property for the purchase price. Both positions cannot be sound. Their argument concedes the sale, admits that the title was in appellee and that he sold the property to Little before he could have taken a mortgage to secure the purchase price. But all this argument about this instrument being a mortgage falls when the light of this record is turned on, because it is shown to be what it purports to be—a note reserving title.

It is argued for appellant that the courts are inclined to declare an instrument a mortgage, if possible, in a doubtful case. But such is only the case where there is a controversy as to what the parties really mean by the contract, as where one party to the contract claims that the transaction was a conditional sale, and the other claims it to be a mortgage. This is shown very clearly in the case of *Barnes v. Holcomb,* 12 Smed. & M. 306, cited by appellant. In that case two instruments were construed by the court to be mortgages. One party to the contract contended there that the instruments were intended by the parties as a mortgage, and the other party claimed the transaction to be a conditional sale with power given to redeem within a certain time. The court in that case very properly held the instruments to be mortgages, because this was shown to have been the intention of the parties, both by the face of the instruments and by the testimony of the parties concerned.

But the court can readily see that there is no authority for appellant's contention in this present case. The case is not similar in any particular to the *Barnes case.* There is no dispute here as to what the parties intended. No right to redeem is mentioned in this contract, and no borrowing of money is shown. None of the ear-marks of a mortgage as pointed out by the courts can be found in this case, with reference to the notes in question. Appellant cites *Klein v. McNamara,* 54 Miss. 90, in which the tests of whether an instrument is a mortgage or a sale, are set out. We ask the court to notice those tests in the light of this record, and it will be driven to the conclusion that this authority is against appellant's contention rather than in his favor: "(1) Was the treaty in reference to a borrowing and lending of money and was the obligation to repay incurred?" The record in this case answers that question in the negative. "(2) Did the relation of creditor and debtor exist before the conveyance and did that relation continue?" The record shows that no such condition as there indicated existed here. "(3) Was there a great disparity in the price of the property?" There is not even a hint of such a thing as this in the case at bar.

Thus we see that the three tests announced by the court in the case cited by appellant are fully met in the case at bar.

We rely in this case upon the general doctrine announced by this court in the case of *Duke v. Shackleford,* 56 Miss. 552, and reaffirmed in many subsequent cases, in which the court has held that the purpose of a note of this character is to secure the purchase money.

The modern doctrine as to what constitutes a sale is very clearly announced in the recent case of *Baker v. McDonald* (Neb.) 1 L. R. A. (N. S.) 474, citing Newmark on Sales, 159.

We insist that W. M. Thompson & Son are not *bona fide* encumbrances in this case. The evidence shows that the deed of trust which they held on the property was given in their favor by Little to secure a pre-existing debt and the evidence further

shows that they then had knowledge of some indebtedness of Little to appellee. A reasonable prudent man would, under the circumstances, have been led to make such inquiry as would have shown the true facts.

The case was by the supreme court affirmed, without written opinion.

*Anderson & Long,* for the appellant, thereupon filed a suggestion of error, and in support thereof contended as follows:

The turning point in this case depends upon whether the appellee was the owner of the property at the time when he claims to have sold the property back to Little with reservation of title. If the appellee at the time did not have the absolutely unconditional title to the property he could not legally sell it as he claims he did. If he were the owner, his title was derived from Little. Yet, can it be held that the transaction between him and Little was sufficient to pass the title from Little to him? We insist that it could not.

The definition of a sale, as laid down in Benjamin on Sales (2d ed.), page 1, is "a transfer of the absolute or general property in a thing for a price in money." And see 24 Am. & Eng. Ency. of Law (2d ed.) 1022.

The essentials of a sale are, first, a mutual agreement; second, competent parties; third, a money consideration; fourth, a transfer of the absolute or general property in the subject of sale from the seller to the buyer. 2 Blackstone, Comm. 446; 2 Kent, Comm. 468; Atkinson on Sales, 5; Story on Sales, 1.

We insist that what happened between appellee and the negro Little, at the time when appellee claims to have purchased and resold the property, did not vest in appellee the absolute or general property in the mules and mare. Appellee only loaned some money to the negro Little and the transaction was in part the continuation of a pre-existing debt, with the mules and mare held by appellee as a security for the payment of the

debt.   Appellee's claim on the mules and mare could be nothing more than an equitable mortgage good only as between the original parties.

Two persons cannot each be the absolute and sole owner of the same thing at the same time.   To consummate a sale there must be an offer and an acceptance, and immediately upon the acceptance of the offer and not before, the contract of sale becomes complete and binding upon both parties.   24 Am. & Eng. Ency. of Law (2d ed.) 1029, note 4.

When Little made his proposition of sale to appellee, appellee had no rights in the property whatever before his acceptance of the proposition; and after such acceptance appellee had only the right, as between him and Little, to subject the property to his unrecorded claim against Little.   Appellee could not retain a greater right or claim against the property than he had parted with to Little.

Hence, the recent judgment of affirmance by this court is erroneous.


FLETCHER, J., delivered the opinion of the court in response to the suggestion of error.

The learned circuit judge gave a peremptory instruction to find for the appellee upon the following state of facts:  One Little, late in the year 1906, became Payne's tenant, and moved upon his plantation.   At the time Little owned two mules, upon which a third party held a trust deed for about $135.   It appears that Mr. Payne had been advised by his attorney that personal property could be sold conditionally and the title thereto reserved to the vendor, and that the lien so reserved would be superior to any subsequent incumbrance by the conditional purchaser.   Payne testifies that he acted in the transaction upon the idea that such an arrangement was a convenient, safe, and economical method of securing his debt, since it would obviate the need for recording fees and other expenses.   Little was anxious for his landlord to take up the debt, and desired a fur-

ther advance of $50 in cash.　Thereupon Payne and Little entered into an agreement by which Little was to sell Payne the mules for $185 and Payne was to immediately resell the property to Little and reserve the title.　This was done; the entire transaction resting in parol.　Subsequently Little mortgaged the property to W. M. Thompson & Son by a trust deed, in which Parker is substituted trustee.　The former trust deed, which was paid by Payne, was satisfied, so that, when Thompson & Son took their security, no incumbrance against the property appeared of record.　It is shown that Little, with Payne's knowledge, obtained supplies from Thompson & Son throughout the year, and, indeed, Payne admits that he encouraged Little to buy from Thompson all the supplies he needed; that, to use his own phrase, he said to Little that "he missed it in not going and loading up on him."

We have no disposition to depart from the rule, now thoroughly established in this state, that personal property may be sold with verbal retention of title, and that the claim of the vendor to the purchase money will prevail over the claim of subsequent grantees.　But we cannot hold as a matter of law that Payne ever actually owned the mules here in controversy. The whole transaction must be examined.　The mules were not purchased from Payne in the first instance.　They were bought from one Lawson.　The sole purpose of the alleged sale to Payne was that title might momentarily vest in him for the purpose of an instantaneous resale, in order that the relation of the vendor and conditional purchaser might exist.　The whole transaction might well be considered as nothing more than a verbal mortgage—an effort to substitute for a trust deed a pretended sale and resale, whereby innocent purchasers and incumbrancers would be defrauded.　If this transaction is to be upheld, chattel mortgages will disappear.　All borrowers upon personal property as security will simply agree with the lender to make a sale, accompanied by constructive delivery of the property, and buy the property back in the same transaction.

We have here an illustration of a most flagrant wrong committed to the manifest injury of an innocent supply merchant. It is true that, under the previous decisions of this court, one taking a trust deed upon personal property must see to it that the person from whom the property was purchased has not reserved the title, or that he has been paid; but he cannot be defeated by constructive sales and resales, had between persons who in reality sustain no other relation than that of creditor and debtor. We will not push the doctrine one inch further than it has already gone. In order for the seller to enforce his claim, he must be in fact the owner of the property, and make a *bona fide* sale thereof to a *bona fide* purchaser, by which sale the actual possession of the property shall be in truth changed. The peremptory instruction should have been given for the appellant, and not for the appellee.

The suggestion of error is sustained, the former judgment vacated, and the cause reversed and remanded.

*Reversed and remanded.*

WHITFIELD, C. J., delivered the following dissenting opinion, in response to the suggestion of error.

The judgment originally rendered in this case was, in my opinion, manifestly correct, and the suggestion of error should be overruled. Indeed, I think a simple statement of the facts is an end to the argument, and I propose to state those facts fully. There was a mare sold to a negro, Little, by appellee, about three years before this transaction, and a trust deed given by Little to secure the payment of the purchase money in 1906; Little at mules. When Little came back to the place of appellee in 1907, Little moved back on appellee's place. At this time he, being unable to pay for the mare, let appellee take her back, and the trust deed was by appellee canceled on the record January 10, 1907.

We come, now, to the two mules in controversy. Those mules had been sold by one J. N. Lawson to Little, on the 24th

day of August, 1905, and Little had given Lawson on that date a note, due October, 1905, at 10 per cent. interest from maturity, for $220, and the trust deed of same date, August 24, 1905, to secure said note; said trust deed covering the two said mules. When Little came back to the place of appllee in 1907, being unable to pay for the mare appellee had sold him, as stated, that mare was delivered back to appellee, and that trust deed canceled, January 10, 1907. At the same time Little brought the two mules he had bought from Lawson onto the appellee's place, and had them there is his (Little's) possession. The note and trust deed, executed by Little on the 24th of August, 1905, to secure J. N. Lawson in the purchase money of these mules, had been, on October 30, 1905, transferred and delivered to one John D. Payne, and at the time Little moved back on appellee's place, in January, 1907, there was still remaining due on these two mules, under this note and trust deed, the sum of about $135. The appellee, having canceled his trust deed on the mare above referred to, on January 10, 1907, bought from Little the two mules, and resold them to Little, reserving the title in himself until the purchase price of the mules should be repaid to him by Little.

There is only one witness to the terms of this sale, and that is R. S. Payne, the appellee in this case. He testifies in the most positive and explicit manner that Little sold him these mules, and he resold them, and also the mare, for $325, and that he was to pay off the trust deed of Lawson, which had been assigned to John D. Payne in October, 1905. Here is what he says "In 1906 he [Little] moved to my place just a few days before Christmas. There was a deed of trust on these two mules he had, and he came to me and told me that if I would pay the deed of trust off, and let him have $50, that he would let me have the mules. We counted up that and the interest on it, and it made it something a little over $145; but I put it all at $175, and when I let him have the $50, with interest on that, that made it $55, and that made $200 in all. And I

said, 'All right, I will take the mules at $200 on this, and I will sell them back to you at $200;' and then I sold him a mare for $125.    The agreement then was that I take the deed of trust on the mare in 1906, and he was to live on my place that next year, and when he moved back to my place, I told him that we would do away with the deed of trust [that is, appellee's deed of trust on the mare], and that he would fix it up with notes, or a note, binding all the stock.    And I also let him have a mare for $125, and we fixed up the three in the same note."  He again and again, repeatedly, testifies expressly, in the most positive terms, that this sale and resale was made.

Now, let us see whether he carried out, on his part, the terms of this sale.    He paid the negro the $50.    He paid John Payne, who held, by transfer, the Lawson note and trust deed on the mules, $135.40, the balance due under that trust deed, on the 16th day of January, 1907, and canceled that trust deed.    As stated, he had already canceled the trust deed on the mare on the 10th of January, 1907.    The negro, Little, seems to have disappeared from the scene.    On January 1, 1908, a year later, for the first time the appellants, Thompson & Son, took a trust deed from Jim Little, some little while before his disappearance, to secure an indebtedness of $182, only $48 or $49 of which was for supplies furnished Little during the year 1907; all the balance being an indebtedness antecedent to all these other transactions—antecedent to the year 1907, as shown by W. M. Thompson's testimony.    This sale of the two mules by Little to appellee, and the resale by appellee to Little, was reduced to writing, and a note given by Little, and that note was in pursuance of that sale.    Appellee testifies as follows: That he "told Little that he was on the John Payne place, and that he [appellee] would pay the trust deed of John Payne off on the mules, and that he [appellee] would furnish him [Little] $50 and would take the mules, and would then sell them back to him [Little] at the same price, reserving title, if Little would move on his [appellee's] place; and that that was the express

contract—that he bought the mules from him in that way, and sold them back to him at the same time and under the same agreement."

Now, a few months later this contract was reduced to writing, and was signed by Jim Little, and is as follows, being a note for the purchase money of these mules:

"325.00   On or before the 17th day of June, 1907, I promise to pay R. S. Payne, or order, the sum of three hundred and twenty-five dollars, same being for the purchase money for the following described property bought of said R. S. Payne, viz.:   One black horse mule, about six years old, name Joe, and would furnish him [Little] $50 and would take the mules, and would then sell them back to him [Little] at the same price, one black mare mule, about six years old, name Hat, and one Texas mare, about six years old, name Emer, all said stock now in my possession; and it is hereby expressly understood and agreed by me that the title and ownership to said stock is to be and remain in the said R. S. Payne until this note is fully paid and satisfied.   This 17th day of June 1907.

"James X. Little."

In view of the fact that this note, reserving title, is in writing, the statement of the majority that "the entire transaction rests in parol" is misleading.   What the majority meant to say was that the part of the transaction, the original agreement, was in parol; but it is absolutely due to be stated, that the case may be put as it is, that this transaction was subsequently reduced to writing.   This is very important, in view of another statement in the opinion, that the "whole transaction might well be considered as nothing more than a verbal mortgage."   If there be any mortgage in this case, it is not a verbal mortgage, but a written mortgage; and it is inconceivable how a mortgage can be worked out of the four corners of this simple promissory note.   There is not a particle of evidence in the case about a mortgage of any kind.   The appellee expressly states that there was a sale of these mules by him to Little.   There is not

a hint anywhere in his testimony, or anywhere else in any other testimony, that there was any mortgage dreamed of. There is no verbal mortgage, according to the testimony; but the best evidence of what the transaction was, in the eyes of the law, was the note, and, of course, it is too plain for discussion that that note is nothing but a simple promissory note, without the semblance of a mortgage in its terms. I dismiss, therefore, the suggestion that there was in this case any mortgage with simply this other observation that the very case cited by appellant (*Klien v. McNamara*, 54 Miss. 90) states three tests as between a mortgage and conditional sale: First. Was the treaty in reference to a borrowing and lending of money, and was the obligation to repay incurred? The record shows nothing of this sort. Second. Did the relation of creditor and debtor exist before the conveyance, and did that relation continue? If appellee told the truth, and he is the only witness, the record completely negatives this test. Third. Was there great disparity between the price of the property and the loan? No reason for this test exists in the record. In short, the mere reading of the note ends at once any suggestion of a mortgage.

But, turning aside from that, we have here the positive and express testimony of the appellee that this transaction was a sale, and nothing but a sale; that it was made in pursuance of legal advice—perfectly sound advice, too, be it remarked; and there was a note taken showing the terms of the sale, and corroborating in every detail the verbal statement of the appellee as to the terms of the sale. Now, let it be noted and emphasized that there is not in the record a scintilla of testimony, written or oral, as to the terms of the sale of these mules. Absolutely the appellee's testimony, as stated, is corroborated entirely by the note, and is not contradicted in the least degree by any testimony of any kind whatsoever; and yet the majority hold that, not only the suggestion of error must be sustained, but that the court below should have charged the jury to find for the appellant. The court below, in my judgment, most prop-

erly charged the jury to find for the appellee, because there was no other testimony than that I have given as to the terms of the sale. And, as to this transaction being a sale with reservation of title, the court below had at least to support its instruction the positive and uncontradicted testimony of Payne and the note. My Brethren have not only no testimony as to what this transaction was to support their conclusion that a peremptory instruction should be given for the appellant, but they assume the jury's function of passing upon the truthfulness of Payne, even when supported absolutely in every respect, by the note. This, it seems to me, is entirely beyond the province of the court; for, if the court were right in any possible view, most clearly and indubitably it could do no more than reverse the case for the determination of the facts of this case by the jury.

But this is not all. The argument of the learned counsel for appellant is self-destructive plainly. First, he argues that appellee never at any time had any title to these mules; and, when that does not work out satisfactorily, he then proceeds to argue that he did have title to the mules, because he must have had it to take the mortgage on the mules, which he says the transaction amounts to. In other words, he strenuously argues, in the first place, that there never was any sale, and that is the whole burden of his argument in this suggestion of error, citing many authorities to show it—that is to say, that there never was any sale by Little to appellee—and then proceeds immediately thereafter to insist that appellee did have title, but simply mortgaged the mules to Little, instead of selling them to him. Another most striking thing in this record is that, to my mind, at least, it is clearly shown that the appellants were guilty of the grossest negligence in not making inquiry of the appellee as to what claim he had on these mules. Surely it was the duty of these supply merchants, knowing, as they admit they did know, that Little was appellee's tenant, living on appellee's place, and necessarily needing supplies, to inquire of

appellee what claim he had on these mules, or what security he had, both for the mules and for supplies. What does the evidence show in this respect? Mr. Thompson testified that he did ask the negro whether this stock was under any incumbrance whatever, and that he said he didn't owe Mr. Payne a cent, and, further, that he never took a mortgage unless he asked if there was any incumbrance on the stuff or stock. That is his express testimony. Think of this man asking a negro, instead of asking Payne, the appellee, on whose place the negro lived; and it further appears that he knew the negro lived on Payne's place throughout the year 1907, yet never asked Payne's permission to supply him, and never asked Payne if he was supplying him, or what claim he had on this stock. Thompson actually embraced in his trust deed the mare, and the only singular thing on his part is that he did not claim the mare. Again, appellee testifies that he told Parker, the trustee, when he came to get the stock, that he had a claim on the stock sufficient to hold them, and that he thinks he told him of the note. Now, the appellant attempted to contradict this by showing that the claim appellee mentioned to the trustee, Parker, was that he had a landlord's lien for supplies; and appellant introduced two witnesses to thus contradict appellee, to wit, the trustee, Parker, and one Pope Tanner, white. But Parker testified that he went to see appellee twice about getting possession of the mules, and that the second time he went back, about two hours after the first time, the appellee did tell him that he had some papers by virtue of which he claimed these mules, and that they (the papers) were good against the stock; and Tanner testified positively that the appellee told him he did have papers under which he claimed this stock. I mention this merely to show that the effort to break down appellee entirely failed, and that the two witnesses, the trustee and Tanner, corroborated the appellee, instead of contradicting him.

One other curious obliquity of vision to me in the opinion of the court: That opinion states: "We have here an illustration

of a most flagrant wrong committed to the manifest injury of an innocent supply merchant." I think the testimony which I have quoted fails to disclose any particular innocence on the part of this supply merchant. He knew this negro, Little, lived on the appellee's place throughout the year 1907. He knew the negro had to be supplied. He himself, at that time, held a past indebtedness from the negro to himself, unsecured, and which he was naturally very anxious to get. He does the curious thing of asking the negro, and not asking the appellee, whether the appellee had any claim on these mules, either for supplies to be advanced, which must be advanced, or for the purchase price of these mules; and all, absolutely all, even the cost of the trust deed, which this innocent supply merchant is out, so far as this transaction is concerned, is $56.07, according to his own testimony. And yet the appellee, who first sought legal advice, and got sound legal advice, and acted on that legal advice, actually paid $135.40 to John Payne, and $50 to this negro, making $185.40, all of which he loses, without the court being at all concerned about this innocent farmer's loss. So far as the "flagrant wrong" is concerned, doubtless one has been committed; but it has been to the injury of the appellee, the landlord.

Once more, and finally, I refer to another expression in the opinion. It is there stated that the "sole purpose of the alleged sale to Payne was that title might momentarily vest in him for the purpose of an instantaneous resale, in order that the relation of the vendor and conditional purchaser might exist." My Brethren have used great felicity of expression in this sentence. The momentary vesting, and the instantaneous resale, are the very extremes to which language can be pressed, in the effort to make, out of mere language, a transaction which the facts in the case do not show. One can almost see the "verbal mortgage" rising into being, out of the mere intensity of the phrasing. But, besides, are not sales and resales on the same day, aye, in the same hour, of every-day occurrence in the busi-

ness world? I think we are on far safer ground when we interpret this plain, simple, promissory note to mean what it says it means; and then, if the court was not right in charging the jury to find for the appellee, we should simply hold that there should have been no charge to find for either party peremptorily, but that the case should be left to be tried by the jury. The court not only sustains a suggestion of error to a charge, not only in perfect harmony with all the testimony in the case as to the sale and resale, but then absolutely proceeds to hold that the jury should have been charged, in the face of all the evidence, to find for the appellant—something which passes my comprehension.

One other observation: The court stresses an expression of the appellee to the effect that appellee told Little that "he missed it in not going and loading up on him." Presumably the court thought there arose an implication from this statement that there was a fraudulent combination between Little and appellee to enable appellee to get supplies from appellant. It is singular my Brethren did not notice that in the redirect examination of appellee he explained this statement, and said positively that that conversation occurred after this lawsuit was begun, and had no reference whatever to the year 1907 and the transactions of that year, which last statement makes it manifest, as it seems to me, that the implication that the court would work out of the first statement does not fairly arise out of the testimony of the appellee.

But I must repeat, in closing, that I think the case ought to have been taken from the jury, and was properly taken from the jury, and the peremptory instruction for the appellee was correct, as we first held, because the testimony of Payne is absolutely without any contradiction, and is, in addition, supported by the written note. Really this is an exceedingly simple case, with absolutely nothing in it, except the long-established doctrine that the vendor of personal property may retain title thereto by parol, which title would be good against innocent

purchasers for value without notice, subsequently purchasing. The real trouble with appellant's counsel is not so much the fact that the case made by this record does not plainly show he has no case, but that he entertains the view that these secret reservations of title are iniquitous and ought not to be tolerated. He is struggling against what he thinks is an unwise law. On this ground I can stand with him without the least hesitation. But who shall change this law, this court or the legislature? Manifestly, as long as the secret reservation of title is the law, we have nothing to do but enforce it. I sincerely trust an act will be passed by the next legislature, requiring that all reservations of this character be recorded. But that is another story.

It seems to me, with all deference to my Brethren, that their holding is erroneous, manifestly, in two respects: Certainly, in not limiting their holding to mere reversal, so that the jury, and not this court, may pass upon the facts of this case; and, second, because their holding, so far as the right to reserve title to personal property is concerned, absolutely abolishes that right.

For these reasons, I dissent *in toto* from the opinion and judgment in this case.